My name is Su Ranjin Sen. I'm here today representing Plaintiff Appellant Ms. Anita Adams. I'd like to reserve five minutes for rebuttal. Please do, but also you should watch the clock. I'll try to remind you if you forget, but it's the advocate's responsibility. Thank you very much, Your Honor. I appreciate that. Just last year, the Supreme Court held that legislative land use permit conditions must be tailored to mitigating project impacts. But Seattle admits that its MHA condition was never designed to be a mitigation program. Instead, it is the City's attempt to capture the value of recent upzoning. For this reason, as well as others, its enforcement can never satisfy the Nolan-Dolan tests for land use permit conditions. Now, this case raises a number of issues, but the most straightforward path to resolution is via Ms. Adams' facial challenge. The District Court held that the Nolan-Dolan tests categorically can never support a facial challenge. That's incorrect. The Court relied entirely on one judge's opinion in a case that involved only Dolan's rough proportionality test. Ms. Adams' briefing explains why that opinion has been abrogated by subsequent Supreme Court precedent, but even accepting it, it would not preclude facial application of Nolan's essential nexus test, and the reason is quite simple. If a condition just has nothing to do with impact mitigation, that is a problem inherent to the condition. Perhaps for this reason, the City does not dispute that at the very least, Nolan's essential nexus test can support a facial challenge. So it appears the parties agree that the District Court's rationale for dismissing Ms. Adams' facial challenge was error. The City offers two alternative grounds for dismissing Ms. Adams' facial challenge. Both of those are incorrect. First, it suggests that there is a special statute of limitations problem unique to Ms. Adams' facial challenge, where supposedly the limitations period began on the day of MHA's enactment. That's wrong. That rule applies only to a narrow category of cases where a law's very enactment caused a one-time harm, such as a single transfer of a property interest from one person to another. That's not this case. Ms. Adams' facial challenge and her as-applied challenge both reflect the same injury, the same harm, that flows from the City's ongoing enforcement of the MHC. So if we're talking facial challenge, that means to succeed, your client has to show that the statute is incapable of a constitutionally permissible application. That is correct, Your Honor. So we've got in the statute, just built into the statute, the possibility of a waiver, either a reduction or a waiver of this performance or payment option, when an applicant, I'm just reading from the ordinance, quote, can demonstrate facts supporting a determination of severe economic impact at such a level that a property owner's constitutional rights may be at risk. Why doesn't that save it from a facial challenge? Yes, Your Honor. It doesn't save it because the facial inquiry looks to whether this restriction can ever be enforced. Why can't it be? Well, it can't be enforced. It's right there in the ordinance. Well, if the only way that this ordinance can be constitutionally applied is by waiving, let me rephrase that. If the only way a restriction can be constitutionally applied is by waiving it, that means it's facially unconstitutional. But no, wait a minute. But if it's going to be waived, it's not going to be applied. Therefore, it's not applied. And therefore, what's the objection? Well, then when it's waived, that doesn't count as an application of the ordinance for purposes of the facial analysis. This is the Supreme Court's decision. Are you reading that language that I just read to you? Are you reading that out of the ordinance? I mean, why doesn't this save the ordinance? What I'm saying is if you look at the Supreme Court case of Los Angeles v. Patel, the Supreme Court explains that in any facial challenge, the inquiry is on the group for whom the law is a restriction, meaning can the law be enforced? So let me put it to you this way, Your Honor. We say this in our briefing. If the MHA condition were to, let's say, something more clearly unconstitutional, let's say that if it applied only to people from the black community like Ms. Adams, it wouldn't save the ordinance from facial review merely because someone like Ms. Adams could seek a waiver. The point is that this restriction could never be constitutionally enforced. And so the city, sure, the city may constitutionally choose not to enforce it. But if government could escape facial review merely by retaining enforcement discretion, that would effectively render facial review a complete nullity. The point is that every single time MHA is enforced, it fails to satisfy the Nolan-Dolan tests. And for that reason, it cannot be enforced. And likewise, it's well settled that a facial challenge is ripe, even if the claimant hasn't undergone a waiver, a variance, or a permit application. And the reason for that, that recognizes that the very existence of a waiver provision can't save a statute from facial review when anything other than waiver would be unconstitutional. Nobody's disputing that the city may constitutionally decide not to enforce MHA. The question is, can it constitutionally enforce it? But the waiver is not a discretionary thing. It's built into the statute that they're entitled to a waiver provided that condition specified is satisfied. Well, Your Honor, that may be. But firstly, the waiver's criteria has nothing to do with Nolan-Dolan considerations. It only looks at the economic impact upon the property owner in what looks more like a Penn Central regulatory takings test. But even aside, the fact is that for any project to which MHA applies, anything other than waiver would be constitutional. Our argument is not that the very enactment of MHA caused the taking. And so the possibility of waiver, that might be possible in a regulatory takings case, where the argument is the government is not allowing me to do anything with my property. Then Your Honor's concerns might make sense because you say, well, they might waive it. Then they'd allow you to do something with your property. But this case has nothing to do with the extent to which the city would allow Ms. Adams to earn a profit from her property. This case is an attack on a specific condition, the MHA condition. And that condition cannot be enforced against anybody without violating Nolan's essential nexus test. And the reason for that is because it applies only to people who wish to add additional housing to Seattle. And the city admits that additional housing, quote, of all kinds, makes housing more affordable generally. That for that reason, the city has up-zoned areas of Seattle. The city has up-zoned these very areas because it recognizes that more housing makes housing more affordable. In fact, a key reason for the housing affordability crisis in Seattle is that there is a housing shortage. There is nobody on the face of the planet who is going to be substantially impeded from accessing housing in Seattle because someone has built a home where yesterday it was an empty field. And so the fact is this restriction just can't be enforced against anybody. So, again, I would direct your honor to the city of Los Angeles v. Patel, which was, though a Fourth Amendment case, it explains that the inquiry for the facial challenge looks at the people against whom this is being enforced. Ms. Adams shouldn't have to and didn't have to, under the case law, submit a waiver request so that the city may waive a condition that we already can observe right now can never be constitutionally enforced. Counsel, let me ask you about your statement earlier that, you know, any housing is good because, you know, that's what the city is trying to do is get, you know, make housing more affordable for folks. But I believe, and maybe I misunderstood it, but didn't the city make the argument that new market rate housing actually increases the need for affordable housing for the people who work to create that housing and sustain those new units? They are suggesting that, your honor, but that is entirely it's a highly attenuated chain of events where even at the end, what the city is saying is that if you build a new house, their X might do Y might do Z, which could lead to new low income jobs, which would mean that I, for the life of me, don't know how contributing toward a low income person's job is going to impede them from accessing housing. If anything, it would help them access housing because you're helping to contribute toward their paycheck. But the fundamental, more broadly, your honor, is that it doesn't, this court doesn't have to find that more housing is the magic bullet for addressing a low income housing crisis. The point is, is that if anything, more housing helps people access housing. And it certainly doesn't substantially impede someone from accessing housing. If you're a low income person, you're not going to find it more difficult, certainly not substantially more difficult to access housing in Seattle, because somebody has built some new housing where yesterday there was an empty field. It will either make it. Well, hold on. What if in order to build that housing, they brought in workers from, I don't know, I don't know, Washington that will say Bellevue or some other part of town to create that housing. And so for at least a short time, they need housing in Seattle. So I, as a low income person, and then now having to compete with a new group of people for this housing. Does that make sense? I understand what you're saying, your honor, but I believe that it would still be too attenuated. And I would draw this court's attention to Nolan itself. In the Nolan case, the Nolans wanted to build a beach house. And the California Coastal Commission said that, okay, we'll let you do that on the condition that you see an easement allowing people to walk across your property. And their stated rationale was if you build this house, it could give the impression to people in front of the house that there's not public beaches behind the house. And if they see people walking across the property, that would alleviate that misimpression and therefore help people access the public beaches. And the court said that this is not a rational basis test, your honor. The burden is on the city to show that the project would substantially impede its low income housing interest. And the city has proffered a highly attenuated set of circumstances, which it's not a conceivable nexus. It's not a possible nexus. It's an essential one. And there is nothing essential relating someone who wants to add housing to the city of Seattle and substantially impeding anyone from accessing Seattle. And if there were, then it would make no sense why the city has upzoned wide swaths of Seattle in an effort to obtain 30,000, 40,000 more market rate units in the name of housing affordability. And let me give you an example, your honor. Stepping back just a moment, this whole scheme just has nothing to do with impact mitigation. Let's say, for the sake of argument, your honor, that there could be some program that's tailored to what your honor just described. That's not this program. This program is tied to the economic value of recent upzoning in the area. Let me give you an example. Right now, Ms. Adams' MHA fees for a four-bedroom home would be roughly $92,000. If tomorrow the city were to upzone her area, allowing taller, denser building, the MHA fees for the exact same project would increase from $92,000 to $101,000 for the same dimensions, the same people living there. This just has nothing to do with impact mitigation. It was never designed to have anything to do with impact mitigation, and that's understandable because the city was operating under a pre-Sheetz, pre-Ballenger world where it didn't think that MHA condition would be subject to no-indulgence scrutiny. But we are now in a post-Sheetz world, and this condition just can't survive. Can I ask you a question that's not really this case? It's not this case, but it may help me understand or think about this case. Would the city of Seattle be able to say any apartment building with more than 50 units, any new apartment building with more than 50 units has to include within those 50 units five units available for low-income people? Could it constitutionally do that? As Your Honor recognizes, that would certainly be a different case. Yes, it is, but I'm asking you, would that be unconstitutional? Well, I'd need to look at what is—well, the city would then, whichever city that does that, whether it's Seattle or another city, the city would have a burden of trying to show why that would satisfy the Nolan-Dolan test, and maybe another city could proffer different arguments to try to meet its burden. And the city would show how it came up with this formula of X number of units per Y structure. But the fact is, in this case, there's just nothing. The city has— So you don't really want to answer my question? Well, Your Honor, to answer your question directly, I think it would be very difficult for a city to meet its burden because, again, more housing makes housing more affordable for everybody. Now, that doesn't mean that a city would— It's fairly common for cities or various governmental entities to require as a condition for sort of permit to build a very large project that some of it be for a low income. I mean, that happens a lot. It is— And you're saying you're not sure whether that's constitutional. Well, Your Honor, it's common, but it's only arisen really within the last 15 years. And, Your Honor, frankly, I think that it is one— that is one small part of the larger puzzle as to why cities on both coasts are experiencing terrific housing shortages. The right way of going about this, Your Honor, we're not suggesting that cities are straightjacketed in their ability to assist low income people in accessing housing. If the city wants to subsidize low income housing, they can do so through taxation. Ms. Adams pays her taxes, including her property taxes. If the city wants land where it can build and run affordable housing itself, it can exercise that domain and do so. But these are ways of the city trying to dump these public burdens on people who just happen to need a land use permit to build on their own property. And so, frankly, Your Honor, I think though that's not this case, and this court need not go that far because of the specific facts of what this actually represents, which is the capture of recent economic value of upzoning. You know, if the end result of these cases, post sheets, is that cities have to go about this the right way, the way that pays for public benefits through the public fisc, then that would inure to the public's benefit at large, including people who find it difficult to access housing. Counsel, I want to remind you. You said you wanted to reserve five minutes. Yes, Your Honor. I was just about to say that unless Your Honors have any further questions, I'll reserve the rest of my time. Thank you. Good afternoon, and may it please the court. I am Roger Winn for the city of Seattle. Today with me is my colleague, Jeffrey Weber. I would like to address first why Ms. Adams' Nolan Dolan claim lacks the necessary predicate, a condition that would be a taking had it been imposed on the city of Seattle   outside the permitting context. And we know that predicate is absent here for the reasons this court explained in Ballinger. Ballinger rejected a challenge to a fee imposed on landlords to reoccupy a unit. And first, this court held that the fee is not a taking because it is a regulation of the landlord-tenant relationship. And it is unlike the fee that was imposed in Kuntz, which was in lieu of, thus this court said, functionally equivalent to a taking of an interest in the real property itself. And second, for the same reasons, this court said, the Nolan Dolan claim failed. The court said that the predicate for such a claim is a condition, quote, such as the granting and easement as in Nolan and Dolan, that would be a taking independent of the conditioned benefit. And because the challenge fee was not a taking, it could not constitute that necessary predicate. The reasoning of Ballinger controls this case, just like the regulation there, the condition that MHA imposes regulates the landlord-tenant relationship. It imposes rent or price control, and Judge Fletcher, you're absolutely right. That is a common practice that courts have routinely and uniformly held never amount to a taking. Or MHA, in lieu of that, imposes a fee in lieu of that non-taking. So under Ballinger, the MHA fee cannot form the predicate of a Nolan Dolan claim. Now, Ms. Adams, in her reply, misreads Ballinger. She says this court declined to apply Nolan Dolan there because the fee there, quote, did not operate directly upon any parcel. But to the contrary, Ballinger conceded, quote, we cannot deny that the relocation fee here is linked to real property. The court just went on to say it's no more linked than a property tax is. And in the very next sentence, Ballinger turned to Kuntz to say the holding of Kuntz is that Nolan Dolan review extends to a fee only where that fee is imposed in lieu of the taking of a physical interest in land. That is the key holding of Ballinger, and that is what controls here. And Ballinger's reading of Kuntz was correct. Again, Kuntz extended Nolan Dolan review to a fee only in the circumstance where that fee was demanded in lieu of the taking of a physical interest in land. And we know that from at least three parts of Kuntz. First is its facts. And the court went out of its way to say that the plaintiff there throughout the litigation maintained that the money that he was forced to pay there was a, quote, substitute for his deeding a public easement, close quote. Secondly, the reasoning of Kuntz matters. The court started by noting that the government needs to offer just one constitutional alternative. So if an in lieu payment gets an automatic pass from Nolan and Dolan, the government would just demand the interest in land and then just to cover its tracks, throw in an alternative in the form of a payment option. The whole point of Kuntz's holding about the fee was to close that loophole. And third, we have to consider the case law that Kuntz said is the most closely analogous. And that's case law about liens. In those cases, the government might get your property instead of your money. The inverse is true for exactions. The government might get your money in lieu of the property. But the point that Kuntz was making was that be it liens or exactions, the money and the property have to be linked in the sense that they are interchangeable. So from its facts and its reasoning and the case law it deemed the most analogous, we know you need more than just a standalone fee to trigger Nolan and Dolan. That fee must be in lieu of the taking of a physical interest in land. Still, trying to find a predicate for her Nolan-Dolan claim, Ms. Adams makes four claims about what MHA forces her to do. None of them is accurate. First, she claims that MHA forces developers to construct units. It does not. It just limits the rent or sales price on a percentage of units that the developer chooses to construct. Second, Ms. Adams says that MHA forces developers to become landowners. Well, that's certainly not true in the context of those who build and then sell the units. So that undercuts her facial claim right there. And then in terms of her as-applied claim, Ms. Adams already is a landlord. Her project, if it were to be built, would merely expand her tenant base. So MHA does not force the status of landlord on her. Third, she says MHA forces landlords to stay landlords for 75 years. Again, that's not accurate. MHA allows for the demolition or the change of use of the building and the units. And finally, she says the units cannot remain vacant. She gets there by misreading the requirement that when you market, you have to market to certain groups. There is no requirement to fill vacancies. The only mention of vacancies that you can find in MHA is in a reporting requirement where the city wants to know how many units you have occupied and how many are vacant expressly for the purpose just of tracking program outcomes. Of course, this Court need not reach the question of whether there is a predicate for a Nolan Dolan claim if you agree with us for our other reasons for dismissing her as-applied and her facial claims, which I'd like to turn to now. In terms of her as-applied claim, it is unripe because she didn't secure a permit decision. Case law is clear about the finality requirement. A plaintiff has to file at least one meaningful permit application, pursue any available waiver or variance, and crucially, get a final decision. Because without that final decision, the Court cannot assess whether a condition has even been imposed, thus whether a taking has occurred, let alone to assess its magnitude to apply the rough proportionality. Counsel, I want to ask you about the waiver. Does it cost any money to seek one? I believe it does, Your Honor. Do we know how much? If it is in the record, I can't recall. Can a layperson adequately request one, or would someone like Ms. Adams need to hire an architect or hire, I don't know, a planner of some sort to help her seek this waiver? Again, not in the record, but in my experience working for the city, of course people can come essentially pro se and pursue permit applications and permit decisions. And as we explained, a standalone waiver request would be considered a permit decision, and staff there is there to help people through that decision, through that process. Okay, how far along do they have to be on their project to be able to get a waiver? How much information do you need to have already? Say I want to go get a waiver, how much information do I already need to have to be able to get that? Can I just say I happen to live in this area, I want to build an apartment, and I want a waiver? Do I need to have plans already? Do I need to know the square footage? Because is it tied to? I'm trying to recall the testimony of our staff person on that particular question. I'm afraid I don't know. But what I can say is that certainly the more detail, the better it would be, the more helpful it would be to help apply those criteria. But I'm certain, again, that the staff could work with the applicant to determine what it is they need for that. So Ms. Adams would then probably have to incur some expense before she could get a waiver? That would be speculation, but she might need to incur some expense, yes. I think I'm right, and you can correct me if I'm wrong, that the record shows us at least this, that she does not have to make a formal application for a permit in order to get a waiver. That is correct. We can entertain a stand-alone waiver application. Without being accompanied by a formal application for a permit? That is correct. Okay, so at least that's an outer boundary? Correct. Okay. And I also wanted to ask you, though, it's my understanding, and maybe this has changed since we were provided with this record, that only two waivers have been requested and only one was granted, correct? Correct. So I don't know how to interpret that. Does that tell me seeking a waiver is a project of futility or that I have a 50-50 shot at getting one? Of course, view it as a 50-50 shot, Your Honor, but, you know, a set of two examples is not a statistically significant set. Of course. But, you know, for the reasons Judge Fletcher, you were exploring with Mr. Senn here, the existence of the waiver provision itself undercuts the facial claim. In a facial challenge, as Mr. Senn acknowledged, the plaintiff has to prove no set of circumstances under which the law can be applied validly. So we not only have the waiver provision, which you were exploring, but we've applied it. And so right there is at least one circumstance that we can point to where it has been applied to grant the waiver. Now, Mr. Senn invokes Patel. That case is distinguishable. In that case, plaintiffs challenge a law allowing for warrantless searches. And the government defended itself by saying, hey, sometimes we actually get a warrant or other times we get consent. And the Supreme Court rejected that defense. Why? Because it didn't involve application of the actual law itself. Here, as Judge Fletcher was exploring, the waiver results only by applying the terms of the statute itself. And Mr. Senn also brought up the hypothetical that they have in their briefing, saying, well, a waiver here would allow the city to cover over a requirement that only certain, only people of certain races would have to go through the permitting process. A waiver there would not avoid the constitutional harm, because I think the constitutional harm there would likely be equal protection or something else other than a taking. If only people of certain race have to go through a process, that right there, whether there's a waiver or not, that's the constitutional violation. But where a waiver, as in this case, can avoid the constitutional harm here, a taking, then it does undercut a facial challenge. I'm trying to figure out whether or not the fact that getting a waiver is probably time consuming and potentially costs money, whether or not that's going to be sufficient to give Article III standing injury. Just having to expend money? Well, expend money and time, right? I don't know what it takes to get a waiver. Well, first of all, I'll go to standing in just a minute, but in terms of the finality requirement and your as-applied claim, that was addressed by this court in, I don't know if I'm pronouncing it correctly, G-U-A-T-A-Y, where the court said it's not a hardship. There is no hardship exception from the finality requirement. There was a church that said we simply cannot afford to go through this permitting requirement, and the court respectfully said we still have a finality requirement. You still have to do it. Also, in Southern Pacific Transportation, this court said there is no futility requirement. The only futility exception, there is only the exception if you are made to go through multiple permit applications. So even though that's not directly standing, I don't believe that that is a sufficient – I mean, I think it's informative to your question. But as for standing, the harm that you have to be able to allege is a harm that is legally protected by the constitutional provision at issue, and here it's the takings clause. The takings clause protects you against the government devaluing your property through a permit condition that takes the physical interest in land or perhaps denies you the permit because you refuse to accede to that or to a fee in lieu. I'm unaware of any case saying that the takings clause protects you from having to incur expense going through the permitting process. So I can concede that the permitting process is not free and that it may involve a fee, but I don't think that is enough to support Article III standing here. The other problem, of course, with Ms. Adams' facial claim is that it's untimely. The three-year limitations period controls 1983 claims here in Washington. For a facial takings claim, that period starts to run upon the law's passage, and that's the holding from this court in Colony Cove and Shear. And Ms. Adams filed more than three years after the— You know, that can't be right, meaning somebody passes— City of Seattle passes an ordinance five years ago. I moved to Seattle. I want to do something. I think the statute is unconstitutional. I can't challenge it because I wasn't here. Of course, you can challenge it as applied, Judge Fletcher, but not a facial one. Of course, a facial claim— I just don't think that's the law. I may have to read some cases, but that does not make sense to me. Okay. Colony Cove would be the first one to start with, Your Honor. I'll go read the cases, but that doesn't—intuitively, that seems to me just dead wrong. Well, if I can, remember that a facial relief is extraordinary relief. It sets a high bar. No, I get that. It's hard to get. And so if someone is unable to bring a facial claim, they still should be able to bring an as-applied claim, but there's going to be a limit. There's a window of opportunity to bring a facial claim. But again, read the case law. I'll go read your case. We'll go from there. One case you should read with skepticism is the one that Ms. Adams relies on in her reply, and that is Thomas v. County of Humboldt. She uses that to say that the limitations period starts when the plaintiff learns of the injury, but Thomas limited its holding to facial claims not based on injury to property rights. Thomas discussed Scheer from this court in 2016, where this court made clear that the period starts upon the law's passage, where the claimed injury is to property rights, namely takings and substantive due process. If this court gets to the point of thinking that Nolan Dolan should be applied to MHA, we ask that you remand the case. That is crucially so that the district court can have the first opportunity to consider the city's motion to exclude Ms. Adams' expert, which would be reviewable for an abuse of discretion, but also to take a shot at the fact-specific findings that would be needed for the rough proportionality test. But I would like to address the nexus issue just in case you disagree with me and you want to, in the first instance, take on application of Nolan Dolan to this case. The nexus test is an apples-to-apples test. It asks, does the permit condition serve the same governmental interest impinged by the project? So using the example that Nolan gave us, if the government bans shouting fire in a crowded theater, they can't allow the shouter to shout just by paying $100 to the government. Why? That would be apples to oranges because enhancing the government's coffers does nothing to mitigate the impact on safety. Apples-to-apples test is a low bar which MHA clears. Its conditions advance the city's asserted interest in addressing the housing needs of low-income households, as Judge D'Alba was exploring with Mr. Sen, because, as the council found, residents of new market-rate housing need services from those who are low-income workers, and that increases the demand specific to low-income housing. Now, the test is not, as Mr. Sen said today, whether the proposal substantially impedes that interest. Nolan uttered that phrase, tying it to the substantially advances test from Egan's, which, as you know, the Supreme Court overruled in Lingle. Nolan mentioned substantially impedes only in the context of assuming the veracity of the government's assertion that it could have, in that case, denied the permit for the house because of its impact on, let's just say, X. But when the court got to applying the apples-to-apples test, it found that the government failed that test because the easement that it wanted was addressing some other impact Y. It was apples to oranges. So whether the impact is substantial doesn't matter. What matters is whether the condition advances the same interest as what is being impinged, and here it does. Ms. Adams and her amici want to reduce all of this to a policy debate. She says that the rising tide of housing supply generally lifts all housing boats, if you will. So they claim MHA is counterproductive because it suppresses that tide. Now, let's set aside for a moment that they offer no Seattle-specific evidence on that. The real matter is that it mischaracterizes the city's interest. Again, as Judge D'Alba was exploring with Mr. Sen, MHA addresses the particular boat, if you will, of low-income housing, and our expert identifies a market failure where the rising tide of general housing fails to lift that low-income housing boat. But again, the nexus question is not whether one strategy is better than another. All that matters is whether the condition in that strategy addresses the interest that the government says is being impinged, and here it does. So unless the court has any further questions, I would just like to close by saying we ask you please to affirm the grant of summary judgment to the city for the reasons that we've laid out. If you think that Nolan Dolan should be applied, we ask you please to remand. Thank you very much. Thank you, Your Honors. I'd like to start with Article III standing and waiver, as Judge D'Alba, you were asking about earlier. Waiver has nothing to do with Article III standing, and that's for two reasons. One, if you look at the case of Yee v. City of Escondido, it's well settled that claimants may present a facial challenge regardless of the possibility of waiver, variance, et cetera, because the basis of the facial challenge is that this restriction cannot be enforced against anyone. And likewise, because having to go through a waiver process at all is a kind of injury, in fact, even if a small one, the Williamson County finality requirement, even if it could apply here to Ms. Adams' as-applied claim, would be only a prudential, not a jurisdictional question. I'd like to discuss about the chances of waiver in this case, Your Honors. The city is only granted one waiver request. At the time it did so, which was shortly after MHA's enactment, the head of the city's waiver process stated, and I quote, this is not only the first, but quote, the only MHA modification likely to be granted. And that was because at that time that that applicant presented very unusual circumstances. He submitted a permit application. Then MHA came into force while the application was being considered, and MHA rendered his project economically unviable. There's no reason to expect that Ms. Adams would obtain a waiver in this case. The reason there's only been two waiver submissions is because the city is telling people that it's a very high burden. Do we have on the record evidence as to how many applications of waivers there have been? There have been two. There have been two. Only two. Only two, but I submit, Your Honor, it's because the city is telling the public that it's a very high burden. How do you know that that's the because? I understand that the city said this. I understand that there are only two. That's what you just told me. But cause and effect? I presume. I think it's a fair presumption, Your Honor. The city told, in fact, Ms. Anita Adams that it's a very high burden to obtain a waiver in her e-mail conversation. And beyond that. And Ms. Adams, of course, did not actually follow through in applying for a waiver. Well, that's because she believed from her e-mail conversation that there was no way the city would entertain a waiver request unless it accompanied a permit application, a full permit application. And by the way. Well, she was told to contact Mr. Van Skuyk, which she didn't do. She was told to contact Mr. Van Skuyk if she had further questions, which she did not. And the person told, she interpreted the person as saying there's no way of obtaining a waiver without submitting a formal permit application. I'll just read you what the e-mail was to her. The application review process is led by David Van Skuyk in our offices. And so he'd be the best person to contact you if you have questions, not further questions. Well, Your Honor, I. . . Well, I have the e-mail in front of me as well. And she said you have done a lot of research in the requirements and process. And unfortunately, we can't give any assurance that your request to waive or modify the MHA requirements would be approved. And then that's followed by the sentence I just read to you. That's right, Your Honor. Regardless, we're talking about an e-mail conversation, not a statute. And the point is the city ordinance also states that any request for a waiver has to accompany a permit application. The city hadn't told anybody, hadn't hinted to anybody that there was such a thing as a stand-alone waiver request until over a year and a half into this litigation. It's never processed a stand-alone waiver request. And regardless, the waiver has nothing to do with Ms. Adams' standing to seek facial relief. And if it is affected, if it does to the extent it could affect her as-applied claim, it would only present prudential concerns, which we submit in our briefing are satisfied here. Lastly, I would like to highlight the stakes of this case. Now, the immediate stakes of this case, of course, involve Ms. Adams and her family. But the record shows that MHA is similarly preventing a host of other black families in Seattle Central District from becoming homeowners. MHA is disproportionately harming Seattle's lower-income and historically marginalized populations, making it more difficult for people to add housing to Seattle in the middle of what the city recognizes as a devastating, ongoing housing shortage. This is not merely unconstitutional, Your Honors. This is profoundly unjust, and it is harming the citizens of Seattle right now. Thank you very much, Your Honors, unless you have any further questions. Any questions? Thank you. And thank you, Counsel. But it's a very interesting and challenging case, and I want to thank both counsel for their excellent arguments to the panel. That case will now be submitted, and the parties will hear from us in due course.
judges: FLETCHER, GOULD, ALBA